**19 So.2d 259**

**Succession of CORREJOLLES.**

**No. 37316.**

June 26, 1944.

Rehearing Denied July 14, 1944.

Frank ·N. Butler and Rudolph J. Weinmann, both of New Orleans, for appellant.

Charles I. Denechaud, Charles I. Denechaud, Jr., and John T. Charbonnet, all of New Orleans, for intervenors and opponents, appellees.

ODOM, Justice.

Miss Celanire L. Correjolles, who was never married and who left no ascendants, died in the City of New Orleans on March 2, 1937, leaving a large estate which she disposed of by last will in nuncupative form by public act dated April 29, 1929. Miss Jeanne M. Hatrel, now the wife of Paul August Tabary, was appointed testa-

mentary executrix with full seizin and without bond. On application of the executrix, there was judgment dated March 8, 1937, ordering the will filed, registered, and executed. By codicil dated September 16, 1936, Miss Correjolles bequeathed several pieces of jewelry to friends, $500 to a cousin, and $500 to a friend. This codicil was in holographic form, and on March 9, 1937, was proved and execution of it was ordered.

The estate of. Miss Correjolles consisted of stocks and bonds appraised at $138,543.-18; notes appraised at $6097.26; certain personal property, not included in special bequests, appraised at $1379; cash amounting to $23,495.10; real estate appraised at $215,000, the total appraised value of all property not including special bequests being $384,514.69.

She bequeathed to relatives and friends her household furniture and practically all of her jewelry. To various charitable institutions, religious organizations, friends, and relatives she bequeathed sums of money amounting in the aggregate to $19,800.

She bequeathed to each of two nephews a life annuity of $1200 per year, and directed her executrix to sell a portion of her real estate and to pay the proceeds to certain named relatives.

The principal item of real estate left by the deceased, and which was not ordered sold, was a lot of ground with a building thereon at the corner of Baronne and Gravier streets, appraised at $200,000. She gave the naked ownership of this building to the Charity Hospital of Louisi-

ana at New Orleans, and the usufruct thereof to the Charity Hospital and to four individuals in the following proportions: 9/13 to the Charity Hospital and 1/13 to each of the four individuals.

After making the above special bequests, she disposed of the remainder of her property as follows:

"All the balance and remainder of my property movable, immovable and mixed and wherever situated that I may possess at the time of my death I give and bequeath to the Charity Hospital of the City of New Orleans, hereby naming and constituting it my universal legatee.

"The legacies to the Charity Hospital are made on the express condition, and condition without which the legacies would not have been made that the said Charity Hospital shall within the shortest space and time after my death, erect and dedicate a building or buildings to be used for Hospital purposes commensurate in importance with the value of the legacies and make it to the memory of Joseph Lenes and Josephine Correjolles Lenes and that on the outside of said building or buildings there be inscribed 'The Joseph Lenes and Josephine Correjolles Lenes Memorial' or other similar and appropriate inscription, said dedication and inscription to remain as long as said building or buildings exist.

"Should the Charity Hospital fail to carry out the conditions of this my bequest to it, then in that event I leave and bequeath all that I have left to the Charity Hospital to be divided in proportion of one fifth to the Home for Incurables, one fifth to the Little Sisters of the Poor, uptown and downtown to be equally divided between them, one fifth to the New Orleans Female Orphan Asylum, one fifth to the St. Mary's Orphan Boys Asylum and the remaining one fifth to the following nieces and nephews or to the survivor or survivors of them, towit: Mary Quays Zettle, Aime Quays Hurley, Roberta Quays McClure and John Correjolles. * * *

"Those that inherit from me in default of the Charity Hospital are subject to the annuities and charges imposed by me on the Charity Hospital."

The executrix paid all debts of the succession, paid the charges of administration; and delivered all special bequests to those entitled to them under the will, and, where special bequests consisted of sums of money to be paid, she paid them out of the cash on hand at the time she was appointed. She still has on hand stocks and bonds worth approximately $100,000, some $10,000 or $15,000 cash, and the building at the corner of Baronne and Gravier streets.

As already stated, Miss Correjolles' will was filed and on March 8, 1937, was ordered executed, and the inventory and appraisement of the property followed within a few days thereafter. The Board of Administrators of the Charity Hospital has not yet erected a memorial to the relatives of the testatrix as she directed.

On July 2, 1942, the Board of Administrators of the Charity Hospital of Louisiana at New Orleans presented a petition to the civil district court, alleging that, under the terms of the last will and testa-

ment of Miss Correjolles, it had been designated and named as residuary legatee of said decedent, "subject to compliance with the terms of the will"; that it had accepted said legacies and agreed to comply with the terms thereof, "as will appear by resolutions heretofore adopted, certified copies whereof will be presented upon the hearing of this matter."

It alleged: "That among the other properties of which your petitioner is residuary or universal legatee is a certain piece of real estate at the corner of Baronne and Gravier streets in the City of New Orleans * * *. That the naked ownership of said property is vested in your petitioner together with 9/13th of the usufruct thereof, the other 4/13th [of the usufruct] being equally divided among the nieces and a nephew of decedent * * *; that the executrix has been paying to the usufructuaries, except your petitioner, their share of the rents and revenues of said properties regularly every month, reserving and accumulating that part of the usufruct due to your petitioner. That in addition to the real estate aforedescribed, the said executrix * * *, according to last account filed for the year 1940, is holding for account of your petitioner in excess of $10,-000.00 in cash, as well as stocks, bonds and other assets of a value in excess of $100,000.00."

It is further alleged that the Board of Administrators of the Charity Hospital "is now ready to comply with the condition in the will which must be fulfilled as a prerequisite to delivery by the executrix of said assets to said Hospital as universal legatee, which said condition, as set forth in the will, is as follows." The petition then quotes that portion of the will which provides that the legacies to the Charity Hospital are made on express condition, without which the legacies would not have been made, that the Charity Hospital shall, within the shortest space of time after the death of the testatrix, erect and dedicate a building or buildings commensurate in importance with the value of the legacies, and make it in memory of Joseph Lenes and Josephine Correjolles Lenes.

It is further alleged that "your petitioner proposes to erect on its property fronting on Gravier Street, in New Orleans, and in such manner as to be incorporated in its main hospital building, two pavilions, one at the west end of said building for white people, and one at the east of said building for colored people, to serve as waiting rooms or entrances for out-patient clinic or ambulatory cases, all as shown on sketches and plans and descriptive specifications prepared for petitioner; that your petitioner has reached this decision after many months of careful consideration and survey of the needs of the Charity Hospital, and has determined that the structures proposed are the only ones that are needed, as there is a surplus of housing for all other purposes in the Institution; that after the said structures have been erected they will need only ordinary up-keeps and no increased staffing will be necessary; your petitioner furthermore avers, as will be shown upon hearing in this matter, that there is a great public need for the pavilions proposed; that out-patients are visiting the Hospital Clinics every week day from

7:30 a.m. to 4:30 p.m. in an average of 800 white people and 1000 colored people, in addition to accompanying friends and relatives, and such patients must frequently wait outdoors in all sorts of inclement weather before they are received in the Hospital."

It is further alleged that petitioner proposes to place suitable tablets on each of these edifices, reading as follows:

"The Correjolles-Lenes Entrance
"Charity Hospital
"Of Louisiana".

It is further alleged that the Board of Administrators of the hospital had caused plans and descriptive specifications and sketches of the proposed structures to be prepared by architects, and that the plans provided that the white pavilion will have a seating capacity of 372 people and the colored pavilion a seating capacity of 312 people; "that these pavilions will be handsome in design and dignified in appearance; and will conform to the architecture of the Main Hospital Building of which they will form a part after completion". It is further alleged that the estimate of the cost of erecting said structures is approximately $60,000.

It is further alleged that the buildings, as above described, are "commensurate in importance with the value of the legacies to be received by the Charity Hospital of Louisiana at New Orleans, under the terms of the will of the said decedent, and a compliance with and fulfillment of those terms." It is further alleged that the Board of Administrators is ready and will-

ing to accept and receive the legacies and to comply in every respect with the terms of the will, "including the payment of annuities as aforesaid, and the erection and dedication of said waiting rooms or pavilions, as required by the terms of the will; that your petitioner cannot erect the said structures until after the delivery of the said legacies", and that:

" * * * your petitioner desires this Honorable Court to interpret the terms of the said will and to rule after due hearing that according to the terms thereof the erection and dedication of said above described pavilions does constitute a compliance therewith, and that the executrix be ordered to file a final account herein and after due proceedings had and the homologation of said account, that said executrix shall be further ordered by this Honorable Court to make delivery of said legacies and to place said Charity Hospital of Louisiana at New Orleans in possession as universal legatee; conditioned upon your petitioner's erecting and dedicating said structures as soon as possible thereafter * * *."

The board prayed that the executrix of the estate be ordered to show cause why she should not be ordered to file a final account, and why she should not be ordered to deliver to the board as universal legatee all of the remaining assets of the estate, " * * * conditioned upon your petitioner's obligating itself to erect and dedicate the structure hereinabove described as a suitable memorial under the terms of the will, and upon the further condition that petitioner assume the obligation of the payment of annuities as recited in the will."

In a supplemental petition, the Board of Administrators alleged that, in case the court should hold that the erection of the memorials proposed does not in fact meet the requirements of the will, it "reserves the right to submit such further plans and proposals for the erection of a suitable memorial, in accordance with such interpretation by and instruction from the Court," and that it is in no wise limited to the submission of one plan only in order to be constituted and recognized as universal legatee herein.

It is further alleged in this supplemental petition that, "because of the exigencies of war, and the present impossibility of obtaining building materials, the erection of the proposed out-patient pavilions (or any other structures) as a suitable memorial may, at this time, be impossible; accordingly, petitioner * * * does agree, upon approval of the memorial plans by the Court, to the deposit in the Registry of the Court, of a sufficient amount of the cash and bonds in this estate to cover the cost of any approved memorial."

The court ordered the executrix to show cause as prayed for, and in her answer she admitted generally the allegations of plaintiff's petitions, and, as to whether the erection of the proposed pavilions would meet the requirements of the will, she said that "she respectfully submits the allegations of same to this Honorable Court for its consideration, interpretation and judgment, as to the requirement as set forth in said last will and testament of the deceased herein."

She further alleged that on November 10, 1942, she filed her fifth provisional account, which was duly homologated, according to which she still had on hand personal property consisting of stocks, bonds, notes, etc., valued at approximately $110,-000, and had on hand the lot and building at the corner of Baronne and Gravier streets in the City of New Orleans, which was appraised at $200,000.

The alternate legatees, that is, those named in the will who were to receive the property bequeathed to the Charity Hospital in case it did not comply with the conditions of the will, came into the case by way of intervention, alleging that they were interested in the outcome of the litigation and desired to become parties thereto. They resisted the claim of the Board of Administrators on several grounds: (1) That, although the bequest to the hospital provided that a memorial building or buildings, to be erected for hospital purposes, should be "erected within the shortest space and time after my death," and although the executrix had repeatedly requested that this provision of the will be carried out, and although approximately seven years had elapsed since the date on which the will was filed and ordered executed, yet no actual effort had been made by the Charity Hospital to erect and dedicate the required building or buildings; (2) that the erection of a building or buildings for hospital purposes has been rendered impossible by the present emergency, coupled with the failure of the Board of Administrators of the hospital to act within the time imposed by the testatrix; (3) that the sole purpose and consideration for the legacies to the hospital—the erection and dedication of a building

or buildings for hospital purposes—has failed because such building or buildings are no longer necessary and their erection would be entirely superfluous; and (4) that the proposed memorials, which the board admits cannot be erected at this time, are not commensurate in importance with the value of the legacies.

The case was submitted on the issues thus raised. Evidence was adduced, and after the trial of the case on its merits the court rendered judgment in favor of the intervenors, the alternate legatees, and against the plaintiff, Board of Administrators of the Charity Hospital of Louisiana at New Orleans, rejecting the demand of said Board of Administrators and dismissing its petition and supplemental petitions and rule to show cause, at its costs, and recognizing the intervenors as particular legatees and as the universal or residuary legatees of the decedent, Miss Celanire L. Correjolles, and, as such, entitled to the property now in the hands of the executrix and to the full possession thereof.

From this judgment the Board of Administrators of the Charity Hospital appealed.

The trial judge did not commit to writing the reasons which prompted him to render the judgment he did. But, whatever his reasons may have been, we think his conclusions were correct.

The testatrix bequeathed to the Charity Hospital the major portion of her fortune. But the bequest was made on certain "express" conditions, "without which," says her will, "the legacies would not have been made." These "express" conditions were that the Charity Hospital "erect and dedicate a building or buildings to be used for Hospital purposes"; that the building or buildings be erected and dedicated "within the shortest space and time after my death"; that the building or buildings be "commensurate in importance with the value of the legacies," and that the building or buildings be dedicated "to the memory of Joseph Lenes and Josephine Correjolles Lenes and that on the outside of said building or buildings there be inscribed 'The Joseph Lenes and Josephine Correjolles Lenes Memorial.'"

Miss Correjolles died on March 2, 1937, and on March 8 her will was filed and registered, and on the same day the court ordered it executed. An inventory and appraisement of the property of the succession was promptly made and filed. The Board of Administrators of the Charity Hospital had prompt notice of the bequest. At a meeting of the board held on April 19, 1937, Mr. Matthews, secretary-treasurer, "reported receipt of certified copy of the inventory of the Celanire Correjolles legacies aggregating $384,500.00," and thereupon it was

"Resolved, that Charles J. Rivet, Vice-President, be and he is hereby authorized to do all and whatsoever may be needful or necessary to accept, demand and receive the legacies, rights and benefits due or accruing to the Board of Administrators of the Charity Hospital of Louisiana at New Orleans under the last will and testa-

ment of the late Miss Celanire Corre-jolles * * *."

The above is quoted from an extract of the minutes of the board, offered in evidence by counsel for plaintiff. It thus appears that the Board of Administrators has had knowledge of the bequest, and of the "express" conditions upon which it was made, at least since April 19, 1937. And yet, between that date and July 2, 1942, the date on which the present proceeding was filed—a period of more than five years—the only steps taken by the board looking toward the erection of a building or buildings to be used for hospital purposes were these:

On May 13, 1938, a committee was appointed to consider the "nature of the Unit to be placed in the building to be constructed from the Correjolles legacies," and the committee recommended on the same day that "a building be erected for Neuropsychiatric purposes." The recommendation of the committee was unanimously adopted. On November 15, 1940, the vice-president of the board "moved that the Correjolles Legacy be dedicated to the erection of a psychopathic building for use in connection with the Charity Hospital, and that the Medical Committee be requested to pursue its study of the question." The motion was unanimously adopted. The chairman of the Finance Committee was. authorized to notify the executrix of the succession of the dedication of the legacies.

At a meeting of the board on December 16, 1940, a member of the board moved that "it is the sense of the Board that we proceed with the project to establish a Psychiatric Unit, that a new building be constructed for that purpose, utilizing the money left by Miss Celanire Correjolles and any other available special funds * * *." On January 23, 1941, a member of the board moved that "the subject of the Correjolles Legacy be referred to the House Committee with the request that they prepare an alternate for the use of this legacy in case it is decided not to use this money for a psychiatric unit." The motion was unanimously adopted. At that meeting the secretary of the board was directed to write to the executrix of the succession and advise her that a committee of the board "has actively in hand the matter of determining a suitable memorial in accordance with the terms of the legacy to the Charity Hospital."

At a special meeting of the board held on April 15, 1941, a member of the board reported that he had recently had a conference with the executrix and the attorney of the Correjolles succession, and "advised them of the Board's plans for a tuberculosis unit. He mentioned that there is now about $140,000 in this fund in bonds and cash, and that the income from the building alone is sufficient to take care of the annuities and bequests."

Nothing ever came of these motions, resolutions, reports, etc. None of the resolutions was carried into execution, and no building or buildings of any character have yet been erected.

Apparently the members of the board finally reached the conclusion that it was not feasible or necessary to erect a build-

ing for any of the purposes theretofore considered, and requested the director to look into the matter and report to the board his conclusions as to the use which should be made of the Correjolles legacies. The director submitted to the board a written report in which he set out in detail his findings and recommendations. He stated that he had considered the erection of a chapel, but that the hospital already had adequate facilities of that character; that he had considered the erection of a recreation pavilion, and that he thought such a building would be of use, but that "space is very limited on the hospital grounds", and that such pavilion "is not so much needed." He considered the erection of an assembly hall or a gymnasium, or a combination of both, adjacent to the nurses' home. He said that in his opinion there was a distinct need for both of these facilities because the present assembly hall was not large enough and because no gymnasium was available for the use of student nurses. As to the building of a separate building for establishing a psychiatric unit, he said this would call for additional maintenance funds which were not then available, and that he believed "that proper housing can be obtained in the present main building for the establishing of a psychiatric unit."

Finally, he suggested the building of pavilions "at the entrance of the white and colored clinic departments in the rear of the hospital." At that meeting, on July 21, 1941, a member of the board stated that he had spoken to the director "and had brought the matter of a suitable memorial for the Correjolles Legacy to the attention of the Board several times," and that, so far as he was concerned, the construction of the pavilions at the rear of the white and colored clinics, as recommended by the director, "would be ideal, as there is a crying need for such facilities." Thereafter, the Board of Administrators decided to erect two pavilions at the rear of the main hospital building, one for white people and one for colored people, to serve as waiting-rooms or entrances for out-patient or ambulatory cases, these pavilions to cost approximately $60,000.

The Board of Administrators instituted this suit, calling upon the court "to interpret the terms of the said will and to rule after due hearing that according to the terms thereof the erection and dedication of said above described pavilions does constitute a compliance therewith".

One of the "express" conditions on which the bequest to the Charity Hospital was made was that the building or buildings to be erected should be "commensurate in importance with the value of the legacies." Our conclusion is, and we hold, that the erection and dedication of such structures as the board now proposes to erect will not constitute a compliance with the wishes of the testatrix as expressed in her will.

The record discloses that the net value of the legacy to the Charity Hospital is approximately $240,000. The alternate legatees suggest that its value exceeds $300,000. It is true, we think, that the value of the property which the executrix will ultimately deliver to the residuary

legatees is considerably more than $240,-000. But the property is burdened with certain fixed charges, which charges must be taken into consideration in arriving at the net value of the legacies. The testatrix provided in her will for a life annuity to each of her two nephews, amounting to $1200 per annum for each. According to calculations made by an expert, the "present-day value" of these annuities is $24,-175. The testatrix also bequeathed to the Charity Hospital 9/13 of the usufruct of the building at the corner of Baronne and Gravier streets and to certain individuals 4/13 of the usufruct of this building. Taking into consideration the ages of the individuals to whom 4/13 of the usufruct of the building was bequeathed, and further considering the present rental value of the building, the expert showed that the amount which would probably have to be paid to these individuals would be $10,731.-25. These charges which will have to be paid by the residuary legatee must, of course, be taken into consideration in figuring the net value of the legacy.

Now, the Board of Administrators of the hospital proposes to erect two pavilions, as above described, at a cost of approximately $60,000, which is only one-fourth of the net value of the legacy. Taking into consideration the fact that these two pavilions are to be erected at the rear of the main hospital building, and considering the nature, type, and cost of them, it would be unreasonable to say that the erection of such structures would be a compliance with the express wishes of the testatrix, which were that the building or buildings erected be "commensurate in importance with the value of the legacies."

The word "commensurate," according to Webster, means "Equal in measure or extent; also, proportionate; corresponding." The word "important", according to the same authority, means "Carrying or possessing weight or consequence; of valuable content or bearing; significant; weighty."

The building or buildings contemplated by the testatrix were to be erected as a memorial to certain relatives. She wanted a monument erected to preserve remembrance of them, and she wanted the monument or memorial to be something important, something significant, something carrying or possessing weight or consequence, something commensurate with the value of the bequest. She said so, and this was one of the "express" conditions on which the bequest was made. It is certain that she did not want the memorial to be insignificant and out of all proportion in dignity and importance to the value of the bequest.

This is shown not only by the express condition that the building or buildings should be "commensurate in importance with the value of the legacies", but also by the provision that the legacy should be used to "erect and dedicate a building or buildings." This cannot be construed to mean that she intended that only part of the legacy should be used for that purpose. What it means is that the entire legacy should be used to erect a memorial building or buildings.

We do not mean to belittle the importance to the hospital of these pavilions.

The testimony of all the witnesses shows that they are badly needed. The point is that they are not commensurate in importance, dignity, significance, and consequence with the value of the bequest. The Charity Hospital cannot take the bequest and ignore the express wishes of the testatrix. She virtually said to the hospital that it would have to comply with her wishes or conditions imposed; otherwise the bequest to it would fall. She made this perfectly clear. She stated that, should the Charity Hospital fail to carry out the "conditions of this my bequest to it, then in that event I leave and bequeath all that I have left to the Charity Hospital" to other named charities and certain individuals.

■ The hospital in its pleadings states that, in case the court should hold that the building of these pavilions at a cost of approximately $60,000 would not be a compliance with the condition imposed by the will, then in that event it should be allowed the privilege of submitting other plans and proposals for the erection of a suitable memorial in accordance with the court's views as to what would meet the terms of the will. The answer to this suggestion is in plaintiff's own pleadings. It alleged and proved that its decision to erect these pavilions was reached after many months of careful consideration and after a survey of the needs of the Charity Hospital, and alleged that it was "determined that the structures proposed are the only ones that are needed, as there is a surplus of housing for all other purposes in the Institution." Dr. Daly, the director, in his report to the Board of Administrators stated that he had gone over the situation most carefully, and stated, in effect, that he could think of no structure or structures other than these pavilions which were needed or which could be erected on the hospital grounds at this time. One of the observations made by him in his report was that "space is very limited on the hospital grounds." The question then is: In case the court should permit the board to submit other proposals, what alternative proposals will it or can it make? It alleged and proved that the pavilions which it proposed to erect would be adequate for the purposes for which they would be used. They cannot be made larger on account of lack of space. There would be no point in building them higher or more ornate. The testimony shows that the pavilions which the board proposed to erect would conform in architectural style to the main hospital building.

■ Furthermore, to permit the board to submit further proposals would result in more delay in carrying out the wishes of the testatrix. In fact, plaintiff alleged in its supplemental petition that, because of the exigencies of war and the present impossibility of obtaining building materials, the erection of the proposed pavilions might at this time be impossible. Accordingly, the board, says the petition, agrees, upon approval of the memorial plans by the court, "to the deposit in the Registry of the Court, of a sufficient amount of the cash and bonds in this estate to cover the cost of any approved memorial."

■ To permit such interminable delay would defeat one of the express conditions on which the bequest was made—that is,

that the hospital should erect the memorial "within the shortest space and time after my death." The testatrix meant, of course, that the memorial should be erected as soon after her death as was reasonably possible.

The time element involved leads to a discussion of another reason why the Charity Hospital has forfeited its right to the bequest, which is that the time limit for complying with the conditions of the will has long since expired.

The testatrix did not limit the time in which the building should be erected in terms of months and years, nor did she intend to do so. What she said, in effect, was that the memorial should be erected as soon after her death as was reasonably possible. The time element was of the essence, and there was a reason for this. At the time she made her will, the testatrix doubtless knew, as did everyone who was familiar with the situation, that there was dire need for the erection of buildings for hospital purposes. According to a report made to the governor by the vice-president of the board for the year ending June 30, 1937, the old buildings on the hospital ground were erected in 1832. The vice-president stated in his report that these old buildings "constituted a group of dilapidated units, which presented not only fire hazards, but which were declared by medical authorities to be unhygienic and unsafe for hospital purposes. This condition, dangerous from both a fire and a sanitary standpoint, was aggravated by the fact that overcrowding existed, requiring in some instances the placing of as many as

three patients in a bed. It would have been impossible under any circumstances to continue the operation of the Hospital in the old edifices. It was imperative, if Charity Hospital was to continue its operations, that a new and modern plant be provided."

Miss Correjolles was no doubt familiar with these conditions, and for that reason she dedicated the bulk of her fortune to an amelioration of these conditions. She wanted her fortune to be used for that purpose as soon as possible.

It is disclosed by the record that by February 1, 1937, which was more than a month prior to the date on which the bequest became available to the hospital, all of the old buildings had been demolished preparatory to the construction of new hospital buildings, so that there was no reason why the board should not at that time have erected a building for hospital purposes in conformity with the wishes of the testatrix.

The reason advanced by the board for its delay in carrying out the conditions imposed by the will is that it had already made plans for the erection of new hospital buildings to cost millions of dollars, and had made arrangements with the federal government to advance the funds for the project. The erection of these new buildings was begun in 1937, after the Correjolles will was registered and ordered executed. The testimony shows that during the time these vast new buildings were under construction, which was some two or three years, the members of the board and all others connected with the project were

extremely busy attending to matters relating to the construction of these new buildings and pertaining to the issuance of bonds in order to obtain the necessary funds from the government. They make a reasonable showing that they had no time to devote to other matters.

But this affords no sufficient reason why the board, if it intended to use this bequest at all, should not have used it in the year 1937. It could have used it at that time because the grounds were vacant. The new building project contemplated the expenditure of some $10,000,000 or $12,000,000, and it is conceivable that a consideration of matters pertaining to this project overshadowed proper consideration of the Correjolles bequest. Regardless of what may have been the board's reason for neglecting to comply with the conditions of the will, the facts are that it could have complied with the conditions on which the bequest was made as far back as 1937, but it failed to do so. In 1942 the board went into court, avowing its desire and intention to comply, then or at a future date, with the express wishes of the testatrix. At that time, however, according to the board's own allegations and admissions, it was impracticable and unnecessary from the hospital's standpoint to erect any memorial except the pavilions, and because of economic conditions it might be impossible to erect even the pavilions until some uncertain future date.

For the reasons assigned, the judgment appealed from is affirmed.

FOURNET, J., concurs.